

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00653-CV

**IN THE INTEREST OF A.C.P.**, A.I.P., A.M.P., M.J-R.P., and M.C.S., Children

From the 166th Judicial District Court, Bexar County, Texas
Trial Court No. 2023PA01264
Honorable Kimberly Burley, Judge Presiding

Opinion by:     Velia J. Meza, Justice
Concurring Opinion by: Lori Massey Brissette, Justice
Concurring & Dissenting Opinion by: H. Todd McCray, Justice

Sitting:        Lori Massey Brissette, Justice
                H. Todd McCray, Justice
                Velia J. Meza, Justice

Delivered and Filed: March 25, 2025

AFFIRMED IN PART, REVERSED IN PART

Mother appeals the termination of parental rights to her children, A.C.P., A.I.P, A.M.P.,

M.J-R.P., and M.C.S.[1]   The Texas Department of Family and Protective Services[2] filed an

emergency petition on August 21, 2023 for temporary managing conservatorship and to terminate

---

[1] To protect the identity of the children and persons through whom the children could be identified, we will refer to appellant as "Mother" and to the children by their initials. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8. While four fathers were party to the matter, their rights were all terminated and none of them challenge the trial court's ruling.

[2] We refer to the Texas Department of Family and Protective Services interchangeably as "the Department" or "CPS."

Mother's parental rights. After a bench trial on the merits, the trial court signed an order terminating the rights of Mother and all fathers to the children.

On appeal, Mother challenges whether the trial court had sufficient grounds to terminate, whether the trial court abused its discretion in naming the Department as the children's managing conservator, and whether her trial counsel provided ineffective assistance of counsel. As set forth below, we reverse that part of the order terminating Mother's rights to her children and affirm the trial court's appointment of the Department as managing conservator of the children.

## 1 Background

## 1.1 The Department's Case

At the beginning of trial, the State introduced without objection, fourteen documents into evidence.[3] The State called two witnesses in their case in chief. The State then rested presenting no other evidence. The extent of the evidence relevant to the termination of Mother's parental rights was confined to the two witnesses and two exhibits relevant to Mother. State's Exhibit 1 was the Status Hearing Order from October 10, 2023. State's Exhibit 2 was the unsigned Family Plan filed on September 25, 2023.

The case began in June of 2023, when investigative caseworker Blanca Montejano[4] responded to a report that a child—A.M.P.—was being treated for a snake bite to the leg. She

---

[3] The background portion of the opinion discusses only the evidence presented at trial. *See In re E.F.,* 591 S.W.3d 138, 142 n.4 (Tex. App.—San Antonio 2019, no pet.) ("Although we recognize the trial court and the parties in this proceeding had many hearings before the date of trial, we emphasize that none of the previous hearings constitute evidence that can support the trial court's order terminating a parent's rights. The only evidence that can support the trial court's order is that evidence admitted at trial.").

[4] Following its split from the Texas Health and Human Services Commission in 2017, the Department is administratively divided into four major programs: Statewide Intake, Child Protective Investigations, Child Protective Services, and Adult Protective Services. *About DFPS*, https://www.dfps.texas.gov/About_DFPS/default.asp. (last visited March 10, 2025), *archived at* https://perma.cc/CBC4-KJVM; *see also* Act of May 31, 2017, 85th Leg., R.S., Ch. 316, § 37, 2017 Tex. Gen. Laws 601, 612. According to Department rulemaking, Statewide Intake fields phone calls from the Abuse and Neglect Hotline, Child Protective Investigations conducts investigations of those intakes, if authorized and necessary, (investigative case work) and Child Protective Services provides services to children and

interviewed A.M.P. who was four years-old at the time. Mother was present during the interview and explained the child had been bitten by a snake. Ms. Montejano described Mother's demeanor as "fine" and "cooperative" during the interview.

Ms. Montejano testified the next time she saw the family was in their home "[d]uring the summertime." Without establishing the date of the contact or how long after the hospital visit the contact occurred, she described the home as an abandoned barbeque restaurant with "holes in the ceiling and the walls." Ms. Montejano described the inside of the restaurant as "really hot."

Ms. Montejano explained that Mother lived in the home with the maternal grandmother and Mother's five children whose ages at the time, ranged from three months-old to fourteen years-old.

The Department then questioned the investigator as to what services she offered to the family at this second meeting to alleviate the concerns of the Department. Ms. Montejano simply stated: "I offered family based."

The investigator explained that her third contact with the family was "during the next joint visit with the family-based worker." No other facts from the visit were elicited other than confirming the family had running water. When asked if the condition of the home "had improved at all," the investigator replied "no."

According to Ms. Montejano, at this third encounter with the family, mother admitted to drug use. Ms. Montejano also had concerns about maternal grandmother's "substance use." Besides stating she "had concerns," the investigator offered no other testimony explaining her concerns about anyone's drug use.

---

their families to prevent the need for removal and services to safely reunify families after a removal (conservatorship case work). 40 TEX. ADMIN. CODE §§ 707.481, 700.1807.

Ms. Montejano testified that at some point during her investigation, the oldest child, A.C.P., was hurt. Specifically, that the child had been stabbed. When she visited the child at the hospital, the child was stable. The relevant details of the stabbing were not elicited at trial but are contained in State's Exhibit 2. According to the exhibit, A.C.P. had been living at a friend's house for approximately three months. On August 21, 2023, A.C.P. was involved in an altercation at a convenience store. A.C.P. and a friend assaulted another person. During the altercation, the child A.C.P. was stabbed. Following removal, A.C.P. ran away from his placement because he didn't want to follow the rules. According to State's Exhibit 2, A.C.P. was "recovered" on September 8, 2023, and was being detained in the Bexar County Juvenile Detention Center.

There was a third incident related to A.I.P. A rattlesnake bit one of the child's fingers on her hand. The snake bite caused necrosis. The child required multiple surgeries on her finger. At the time of removal, the child was in the hospital recovering from the injuries. While Ms. Montejano did not testify about the facts and circumstances of this incident, the information was contained in State's Exhibit 2.

Ms. Montejano testified the Department initiated removal because "we didn't have any appropriate caregivers to assist with safety intervention" and "for the conditions of the home."

The second witness, Michelle Saldana, was the conservatorship caseworker for the Department. Ms. Saldana testified she was assigned to the case in August of 2023, but she never visited the home where Mother lived. According to Ms. Saldana, she was unable to assess the home because when she attempted to visit, there was a sign on the door: "If you enter this property, you will be shot." The Department proffered no other evidence regarding the status of the home at the time of the final trial.

Ms. Saldana next testified that Mother did not maintain communication with the Department throughout the case, and at the time of the trial, Mother was being held in the county jail. According to Ms. Saldana, she visited Mother at the jail and she was in custody on a motion to revoke probation and an evading arrest charge. When asked whether Mother *completed* the services in her plan, Ms. Saldana testified she had not. Ms. Saldana testified Mother took a drug test at the beginning of the case, visited the children "on and off" and only *completed* 13 of the 48 visits. Ms. Saldana testified Mother shared a strong bond with A.C.P. and A.I.P.

With regards to the best interests of the children, Ms. Saldana simply stated she didn't feel Mother had the ability to keep the children safe. In support of her feelings, Ms. Saldana referenced a video visit with the children where Mother allowed A.M.P. to have contact with M.J-R.P.'s biological father, "Michael." Ms. Saldana testified Mother told A.M.P. to not tell the caseworker and the child recanted the story of abuse, refusing to talk about it anymore after that event. During the case, the Department made a finding of "reason to believe" that Michael sexually abused A.I.P. On cross examination regarding Michael, Ms. Saldana testified she did not believe he had been charged or would be charged criminally. Ms. Saldana also explained that she discussed the allegations with mother, grandmother, and aunt. According to her, they all had the same reaction—surprised and seemingly not believing the accusation.

Ms. Saldana testified Mother had not provided proof of income and proof of stable housing. The Department asked no other questions of Ms. Saldana and, thereafter, rested.

## 1.2 Mother's Case

Mother testified in her defense at trial. Mother testified she never received child support from any of the fathers because they were either incarcerated or could not be found. Mother testified that when the case started, she had been working for six months as a janitor at City Base.

Mother explained that maternal grandmother helped watch the children so she could work. Mother testified that she spent all her income providing for her five children. She testified that A.I.P. was not bit by a snake but instead by a rabbit. Mother missed two shifts at work due to A.I.P. being in the hospital and lost her job. Mother testified she missed visits with her children because she lacked transportation. She primarily relied on the bus to get to the visits. The area where she lived did not have a bus route, so she was required to walk a long distance to find a bus route to take her to the visits. She testified the Department also cancelled visits after she arrived. Mother generally denied using drugs or having a drug problem. Mother admitted testing positive for alcohol during the time this case was pending. Mother testified she loved her children and wanted them back. Mother explained she was engaged in family violence classes while in the jail and was on a wait list for other classes. Regarding her criminal charges, Mother testified she did not have a court date set for the probation revocation and believed she could be reinstated on probation. Mother also admitted being charged with evading arrest. Mother asked that her rights not be terminated as she loved her children. She explained that her children knew she loved them. She stated, "my children will tell you a hundred percent that I love my children . . . I just need another chance."

On cross examination, Mother acknowledged it was wrong to put A.M.P. on the call with Michael, but claimed the child cried and asked to speak to who the child believes is her father. Mother stated she wanted justice for A.M.P. Mother committed to keeping her children safe.

## 2  Standard of Review

A suit involving the potential termination of a parent's right to a child is of constitutional import. *See In re S.J.R.-Z.*, 537 S.W.3d 677, 683 (Tex. App.—San Antonio 2017, pet. denied) (citations omitted). But a parent's rights "are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that

emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). Striking that balance, a trial court may terminate a parent-child relationship only if it finds by clear and convincing evidence one predicate ground enumerated in Texas Family Code section 161.001(b)(1) and also finds that termination is in the child's best interest. TEX. FAM. CODE § 161.001(b)(1)–(2); *see, e.g., In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024) (per curiam). Clear and convincing evidence requires proof that will produce in the factfinder's mind "a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007. This heightened standard "guards the constitutional interests implicated by termination, while retaining the deference an appellate court must have for the factfinder's role." *In re O.N.H.*, 401 S.W.3d 681, 683 (Tex. App.—San Antonio 2013, no pet.).

When reviewing the evidence in a parental termination case, we apply the well-established standards associated with both a legal and factual sufficiency review. *In re J.M.G.*, 608 S.W.3d 51, 53 (Tex. App.—San Antonio 2020, pet. denied) (internal quotation omitted) (citation omitted). First, in a legal sufficiency review, we "view the facts in a light favorable to the findings of the trial judge, who heard the testimony, evaluated its credibility, and dealt the closest with the evidence at hand." *In re R.R.A.*, 687 S.W.3d 269, 276 (Tex. 2024) (quoting *In re J.F.-G.*, 627 S.W.3d 304, 315 (Tex. 2021)) (internal quotation omitted). We will not substitute our own judgment for that of the factfinder. Instead, the factfinder is the sole judge of evidentiary weight and credibility, including witness testimony. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). And, in terms of evidentiary weight and witness credibility, we will "defer to the [factfinder's] determinations, at least so long as those determinations are not themselves unreasonable." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (quoting *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)) (internal quotation marks omitted). In our review, we "must assume the factfinder

resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). While we will disregard all evidence contrary to a factfinder's determination if "a reasonable factfinder could have disbelieved or found it to have been incredible[,]" we will not disregard undisputed evidence even if it does not support the trial court's finding. *Id.*; *In re C.E.,* 687 S.W.3d at 308. In our factual sufficiency review, we consider the entire record and determine whether, in light of the entire record, any disputed evidence "is so significant that a factfinder could not reasonably have formed a firm belief or conviction" on the challenged finding. *In re J.F.C.*, 96 S.W.3d at 266.

### 3    Legal and Factual Sufficiency of the Evidence Supporting Predicate Grounds

Mother's parental rights were terminated under (D), (N), and (O). Mother argues the evidence is legally and factually insufficient as to each ground. We disagree.

### 3.1    Section 161.001(b)(1)(D)

To terminate parental rights pursuant to subsection (D), the Department must prove by clear and convincing evidence the parent knowingly placed the child, or allowed the child to remain, in conditions or surroundings that endangered the child's physical or emotional well-being. TEX. FAM. CODE § 161.001(b)(1)(D); *In re I.N.D.*, No. 04-20-00121-CV, 2020 WL 2441375, at *3 (Tex. App.—San Antonio May 13, 2020, pet. denied) (mem. op.). "Conditions or surroundings" establishing endangerment include "[i]nappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis." *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (citations omitted). "Endanger," as used in subsection (D), means to expose to loss or injury or to jeopardize a child's emotional or physical health. *See Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (construing predecessor statute). An environment that endangers the child may be created

by the physical living conditions in the child's home or by the conduct of a parent living in the home. *In re R.S.-T.*, 522 S.W.3d 92, 108–09 (Tex. App.—San Antonio 2017, no pet.). A parent knowingly places or allows a child to remain in an endangering environment when the parent is aware of the potential danger but disregards it. *In re M.R.J.M.*, 280 S.W.3d at 502 (citation omitted). A child may therefore be endangered when the home environment creates a potential for emotional or physical injury even where the injurious conduct is not directed at the child and the child does not suffer injury. *Boyd*, 727 S.W.2d at 533 (citation omitted); *In re I.N.D.*, 2020 WL 2441375, at *3 (citation omitted).

"The relevant period for review of conduct and environment supporting termination under statutory ground D is before the Department removes the child." *In re R.S.-T.*, 522 S.W.3d at 109 (citing *J.O.A.*, 283 S.W.3d at 345); *see In re. J.W.*, 645 S.W.3d 726, 749 (Tex. 2022). Because the relevant period for review of conduct and environment supporting termination under subsection (D) is before the Department removes the children, evidence regarding Mother's actions after the Department had removed the children is irrelevant to the sufficiency of the evidence supporting termination under subsection (D). *See In re R.S.-T.*, 522 S.W.3d at 109; *In re J.W.*, 645 S.W.3d at 749.

## 3.2    Evidence Presented at Trial

The Department's investigation began when A.M.P.—five years old at the time—was hospitalized for a snake bite[5] on her leg. Soon after, A.C.P.—fourteen years old at the time—was in an altercation at a convenience store during which he was stabbed in the abdomen, resulting in his hospitalization. Later in the investigation, A.I.P.—twelve years old at the time—was also

---

[5] The family service plan states the bite was "possibly" from a rabbit or a snake. Ms. Montejano testified it was from a snake. Mother testified it was from a rabbit.

admitted to the hospital after being bitten on the hand by a snake in the yard outside the home. A.I.P.'s snakebite resulted in permanent disfigurement requiring surgery.

Ms. Montejano testified that A.C.P. was living with a friend. She also testified that Mother knew of A.C.P.'s whereabouts. Following his stabbing, A.C.P. required surgery to fix a hernia created by the wound.

At the time of removal, the children were living with Mother and maternal grandmother. Ms. Saldana testified Mother admitted to a history of substance abuse. The service plan indicates Mother tested positive for cocaine at the time of removal and that Mother denied current use of methamphetamines or marijuana. Maternal grandmother was the primary caregiver for the children while Mother worked. At trial, Ms. Montejano testified she had "concerns" about grandmother's substance abuse, but did not elaborate.

Ms. Montejano inspected the home where Mother, the maternal grandmother, and the children were residing—an abandoned barbeque restaurant. The extent of her testimony regarding the conditions of the home was as follows: "It was an abandoned barbeque restaurant that they were living at. And there w[ere] holes in the ceiling and the walls." It was summer during the visit and "[i]t was really hot in there."

Ms. Saldana testified that A.M.P. and A.I.P. each made outcries of sexual abuse. A.M.P. alleged that M.J-R.P.'s biological father, Michael, "inappropriately touched her." A.I.P reported sexual abuse by Michael to her Mother, her maternal grandmother, and an aunt. Prior to removal, Michael had been arrested for sexual assault of another child. The Department confirmed an administrative finding of "reason-to-believe" as to the sexual abuse of A.I.P. Ms. Saldana discussed the allegations with Mother who did not believe her daughters. At trial, Mother testified she believed A.I.P. and wanted her to "get justice" for what happened to her.

**3.3    Analysis**

The Texas Supreme Court has consistently re-affirmed the definition of endangerment under the termination statutes: "endanger" means "to expose to loss or injury; to jeopardize." *Boyd*, 727 S.W.2d at; *In re R.R.A.*, 687 S.W.3d at 271–72 (describing the "ordinary meaning" of "endanger" and recognizing the "longstanding definition of endangerment pronounced in" *Boyd*). The appropriate standard of review requires us, in a legal sufficiency review, to view all evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re C.E.*, 687 S.W.3d at 309.

Here, the undisputed evidence establishes that the conditions of Mother's home led—on two separate occasions—to the hospitalization of two of her daughters from animal bites. If Mother did not know her children were exposed to wild animals at the time of the first bite, it is reasonable for the factfinder to infer that Mother knew about—yet disregarded—such conditions by the time of the second bite. *In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *17 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.) ("[P]arental neglect can be as dangerous to the children's well-being as direct abuse and neglecting the children's physical condition constitutes endangerment.").

Furthermore, Mother was aware of A.C.P.'s living arrangements. That arrangement resulted in A.C.P. using marijuana, failing to attend middle school, being involved in an assault, and being stabbed. It is reasonable to infer the home environment exposed him to injury.

Finally, the factfinder heard evidence that A.I.P. and A.M.P. were sexually abused by M.J-R.P.'s father. While the testimony could have been developed more fully, the caseworkers' statements regarding the sexual abuse were not mere opinion. *Cf. In re T.S.*, No. 01-22-00054-CV, 2022 WL 4474277, at *21 (Tex. App.—Houston [1st Dist.] Sept. 27, 2022, no pet.) (mem. op. on reh'g) (disregarding as conclusory the caseworker's testimony that current placement was "safe

and stable"); *In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, no pet.) (disregarding as conclusory the caseworker's testimony that "the children need a loving family that will care for them and take care of their needs"). Rather, the testimony reflects what the caseworkers heard: two children accusing an adult man of inappropriate sexual contact. On this record, the factfinder could reasonably conclude that sexual abuse occurred in the home. *In re T.D.*, No. 04-24-00185-CV, 2024 WL 4177965, at *5 (Tex. App.—San Antonio Sept. 13, 2024, no pet.) (mem. op.) (noting that sexual abuse of a child in the home allows reasonable inference of an endangering environment for all children in the home "who may either discover the abuse or be abused themselves").

Not only did the environment in which Mother placed her children expose them to a substantial risk of harm—it resulted in actual harm. We hold the evidence, while not overwhelming, is legally sufficient to support the trial court's endangerment finding under subsection (D). We also hold that the contrary disputed evidence is not "so significant that a factfinder could not reasonably have formed a firm belief or conviction," and thus the evidence is factually sufficient. *See In re J.F.C.*, 96 S.W.3d at 266.

**3.4    Conclusion**

Because we find sufficient evidence supporting the trial court's findings as to subsection (D), we need not address the evidence supporting the remaining predicate grounds. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (recognizing that "[o]nly one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination"). Mother's first, second, and third appellate issues are overruled.

## 4    Sufficiency of the Evidence Supporting the Best Interest Finding Under Section 161.001(b)(2)

Mother argues the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the children's best interest.

"[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing TEX. FAM. CODE § 153.131(b)). We strictly scrutinize termination proceedings in favor of the parent. *In re N.L.D.,* 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.). And because of the strong presumption in favor of maintaining the parent-child relationship and the due process implications of terminating a parent's rights to her minor children without clear and convincing evidence, "the best interest standard does not permit termination merely because a child might be better off living elsewhere." *In re J.G.S.,* 574 S.W.3d 101, 121–22 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (internal quotations omitted); *see In re W.C.,* 98 S.W.3d 753, 758 (Tex. App.—Fort Worth 2003, no pet.). Termination of parental rights should not be used as a mechanism to merely reallocate a child to better and more prosperous parents. *Id.*

In determining whether the child's parent is willing and able to provide the child with a safe environment, the trial court should consider the relevant factors set out in section 263.307(b). *See* TEX. FAM. CODE § 263.307(b). In addition to these statutory factors, in considering the best interest of the child, a factfinder may also consider the nonexclusive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors are neither all-encompassing nor does a court need to find evidence of each factor before terminating the parent-child relationship. *In re C.H.*, 89 S.W.3d at 27; s*ee In re E.A.R.*, 672 S.W.3d 716, 722 (Tex. App.—San Antonio 2023, pet denied) (noting that a best interest finding does not require proof of any particular factor). "Evidence of a single factor may be sufficient for a

factfinder to form a reasonable belief or conviction that termination is in the child's best interest." *In re E.A.R.*, 672 S.W.3d at 722 (quoting *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio July 25, 2018, pet. denied)). However, the presence of scant evidence relevant to each factor will generally not support a finding that termination of parental rights was in the child's best interest. *In re R.H.*, No. 02-19-00273-CV, 2019 WL 6767804, at *4 (Tex. App.—Fort Worth Dec. 12, 2019, pet. denied) (mem. op.); *In re A.W.,* 444 S.W.3d 690, 693 (Tex. App.—Dallas 2014, pet. denied).

Finally, in determining whether termination of the parent-child relationship is in the best interest of a child, a factfinder may also judge a parent's future conduct by her past conduct. *In re E.A.R.*, 672 S.W.3d at 722 (citing *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied)). The predicate grounds for termination may also be probative of best interest. *Id.* (citing *In re C.H.*, 89 S.W.3d at 28). In parental-termination proceedings, DFPS's burden is not simply to prove that a parent should not have custody of her children; DFPS must meet the heightened burden to prove, by clear and convincing evidence, that the parent should no longer have any relationship with her children whatsoever. *See In re K.N.J.,* 583 S.W.3d 813, 827 (Tex. App.—San Antonio 2019, no pet.); *see also In re J.A.J.,* 243 S.W.3d 611, 616–17 (Tex. 2007) (distinguishing conservatorship from termination).

### 4.1    Analysis

**Desires of the children.** The trial court heard that Mother shared a strong bond with A.C.P. and A.I.P. Ms. Saldana testified that M.J-R.P. "has a strong attachment" to his foster father. There was no evidence presented—either positive or negative—regarding the remaining children's placement preferences.

**Present and Future Physical and Emotional Needs.** We detail the evidence relevant to this factor for each child from oldest to youngest. At removal, A.C.P. was not regularly attending school. As a result, he was working at below grade level in more than half of his classes. He was exhibiting violent behavior and experienced stressful interactions with family members and had moved to a friend's house. He was smoking marijuana daily and drinking to the point of intoxication. But he was demonstrating "adequate social skills and [was] able to obtain and maintain trusting relationships with his peers" and his "physical and cognitive abilities were consistent with age." Ms. Saldana testified that A.C.P. has no plans to return to the streets and intends to enlist in the military.

At removal, A.I.P. was admitted to Methodist Hospital with a snake bite to her hand that had caused necrosis and required surgery. She, as well, was working below grade level in at least one of her seventh-grade classes. Other than that, A.I.P. exhibited "developmentally appropriate emotional/coping responses" and maintained "situationally appropriate emotional control" despite situation-related depression and anxiety. The family service plan states A.I.P. "experiences positive interactions with all family members and feels safe and secure in the family," has "adequate social skills and is able to maintain trusting relationships with her peers," and has never used drugs or alcohol. In fact, she has chosen not to abuse substances despite peer pressure to do so.

At beginning of the case, A.M.P. was recovering from an animal bite, had "severe dental concerns," was not up to date on immunizations and had an untreated speech impediment. Mother described her to the Department as "very active, mean, clingy, and bossy for her age." But the family service plan states A.M.P. "experiences positive interactions with all family members and feels safe and secure in the family" and "enjoys and participates in a variety of age and developmentally appropriate social activities."

Both M.J-R.P. and M.C.S. were described as "in good health" at the time of removal, but behind on immunizations. Ms. Saldana testified M.J-R.P.—two years old at the time of removal—had "some problems with his speech," and the Department was working to secure speech therapy and occupational therapy for him.

**Emotional and Physical Danger to the Children Now and in the Future.** We have already determined there is legally and factually sufficient evidence to support the trial court's endangerment finding. Thus, the evidence of Mother's endangerment of the children before and after removal may be considered as probative of best interest. *See In re E.A.R.*, 672 S.W.3d at 722. As discussed above, Mother placed her children in an abandoned barbecue restaurant where two children were bit by wild animals and another was stabbed after leaving to live with a friend. Mother also tested positive for cocaine at the time of removal, supporting an inference that Mother used cocaine prior to the removal. *In re A.M.O.*, No. 04-17-00798-CV, 2018 WL 2222207, at *2 (Tex. App.—San Antonio May 16, 2018, no pet.) (illegal drug use can support a finding that termination of the parent-child relationship is in the best interest of the child). And Mother attended only thirteen out of 48 scheduled visits with her children. Further, the service plan, which was admitted as evidence at trial without objection, indicated A.C.P. was skipping school, smoking marijuana and drinking alcohol, and that Mother was aware of his behavior.

However, the mere fact of endangerment does not mean termination is in the children's best interest. *See In re C.H.*, 89 S.W.3d at 28 (noting that while evidence relevant to the predicate grounds may be probative of best interest, such evidence does not relieve the Department of its burden to prove best interest). As mentioned, the evidence supporting endangerment, while sufficient to form a firm belief or conviction, was not overwhelming. Following the bite, Mother killed the snake so she could show medical staff. And there is no dispute that Mother immediately

took the children to the hospital and stayed with them until they were released. Though this cost Mother her job, Mother's actions were entirely appropriate after the endangerment resulted in injury.

**Parental Abilities and Programs Available.** Ms. Montejano testified that she offered family-based safety services to Mother prior to removal. However, no testimony was elicited about what services were offered, no facts about what concerns would be alleviated by the services, and no indication that the family even accepted the plan. After removal, Mother was offered a service plan providing domestic violence classes, parenting classes, a psychological evaluation, a psychiatric evaluation, individual therapy, a substance abuse assessment, and random drug testing. At trial, Ms. Saldana initially testified that Mother never engaged in services, then corrected herself, saying Mother drug tested at the beginning of the case. Other than Ms. Saldana's broad, contradictory statement that Mother engaged in no services, there were no specifics about her noncompliance: no discussion of failed drug tests, lack of attendance with classes, or failure to enroll in therapy. *See In re D.B.T.*, No. 04-14-00919-CV, 2015 WL 1939072, at *4 (Tex. App.—San Antonio Apr. 29, 2015, no pet.) (holding a parent's failure to complete a service is not probative of the child's best interest when the Department fails to identify the need for the service). Therefore, Ms. Saldana's broad statement is conclusory opinion testimony and could not have reasonably assisted the factfinder in determining Mother's noncompliance with services. *See In re E.J.C.*, No. 04-23-00519-CV, 2023 WL 7367772, at *5 (Tex. App.—San Antonio Nov. 8, 2023, no pet.) (mem. op.) (conclusory testimony of caseworker, even if uncontradicted, does not amount to more than a scintilla of evidence).

To the contrary, the service plan indicates Mother is employed, pools resources with maternal grandmother, and uses government assistance programs to provide food for her children and health insurance.

**Stability of the Home or Proposed Placement.** There is no evidence Mother continued to use illegal substances after removal. According to Ms. Saldana, Mother was being held in jail for evading arrest at the time of trial. However, there was no testimony about how long Mother would be held or any context for Mother's alleged criminal activity. Contrary to the trial court's findings, Mother testified that her home has been "fixed [] up" with air conditioning units, baths, "we have everything."

**Additional Considerations.** Mother was removed from her parents as a child and grew up in foster care. According to Mother, she developed depression and anxiety as a result.

## 4.2 Conclusion

We hold that while there was clear and convincing evidence of endangerment *pre*-removal, the record contains paltry evidence of *post*-removal facts. Because the central cause of removal was the condition of the home and the predictable consequences of living in the situation Mother found herself in, it is inexplicable that so little evidence was elicited about the state of the home during the course of the Department's case—and the only such evidence was Mother's statements that she fixed up the home. *See In re K.M.L.*, 443 S.W.3d 101, 113 (Tex. 2014) ("In cases requiring clear and convincing evidence, even evidence that does more than raise surmise and suspicion will not suffice unless that evidence is capable of producing a firm belief or conviction that the allegation is true."). This along with the understandable mitigating circumstances of poverty and lack of transportation, leads us to conclude no reasonable factfinder could form a firm belief or conviction that termination was in the children's best interest. *See id.* (citing *In re J.F.C.*, 96 S.W.3d

at 266); *see also In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, no pet.) (best interest cannot merely be supported by evidence that the child would be "better off living elsewhere").

Therefore, we hold there was legally insufficient evidence to support the trial court's best interest finding. Mother's fourth issue is sustained.

**5     Sufficiency of the Evidence Supporting Conservatorship Finding Under Section 153.371**

Mother also challenges the trial court's finding pursuant to Texas Family Code section 153.371 naming the Department the managing conservator of the children. "Undoubtedly, the fundamental concern underlying both [sections of the Texas Family Code addressing termination of parental rights and conservatorship] is the same: the [children's] ultimate well-being." *See* TEX. FAM. CODE §§ 161.001, 153.131. But the Texas Supreme Court has recognized that "the evidence supporting termination under the specific criteria in section 161.001[(b)](1) could be insufficient, and at the same time still support the determination that appointment of a parent as conservator would impair the [children's] physical health or emotional development for reasons unrelated to the section 161.001[(b)](1) criteria." *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007).

To legally sever the relationship between a parent and their child, there must be evidence of "parental conduct amounting to abandonment, neglect, or endangerment" sufficient to justify such a permanent and irrevocable decision. *Id.* at 615; TEX. FAM. CODE §161.001(1). But, when a court is determining whether to name someone or some entity other than the parent as the child's managing conservator, the question is instead whether "appointing a parent would not be in the child's best interest because it would significantly impair the child's physical health or emotional well-being." *In re J.A.J.*, 243 S.W.3d at 616, *citing* TEX. FAM. CODE § 153.131(a) (internal quotations omitted).

"Moreover, the quantum of proof required to support a termination decision differs from the level necessary to support a conservatorship appointment." *In re J.A.J.*, 243 S.W.3d at 616. Specifically, termination requires a showing of clear and convincing evidence while the question of conservatorship is determined by the lower burden of preponderance of the evidence. *See* TEX. FAM. CODE §§ 161.001, 105.005; *see Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990). As a result, appellate review is more stringent for termination decisions. *In re J.A.J.*, 243 S.W.3d at 616 (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). While we reviewed the termination decision, above, through the lens of a sufficiency of the evidence review, a conservatorship decision is reviewed for an abuse of discretion, with reversal being warranted only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d at 616 (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)); *see also Brokenleg v. Butts*, 559 S.W.2d 853, 854 (Tex. Civ. App.—El Paso 1977, no writ) (reversing termination but affirming appointment of grandparents as child's conservator). "A court acts within its discretion as long as there is some evidence of a substantive and probative character to support its decision on conservatorship." *In re C.F.*, 565 S.W.3d 832, 845–46 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (internal quotation omitted); *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam).

Due to the parental presumption, the trial court was required to appoint Mother as the children's conservator unless "the appointment would significantly impair the child[ren]'s physical health or emotional development." TEX. FAM. CODE § 153.131(a). The trial court made such a finding as to each child. Therefore, the only question is whether *some* evidence supports the trial court's findings.

At the time of trial, Mother had been arrested and was facing court action on a motion to revoke probation. Mother had proven to be an inappropriate caregiver at the start of the case, resulting in an endangerment finding under subsection (D). And the Department presented evidence that, at removal, the children presented with health problems, dental issues, and school attendance problems. The trial court was presented with *some* evidence sufficient to appoint the Department as managing conservator of the children instead of Mother. *In re J.A.J.*, 243 S.W.3d at 616. We conclude the trial court properly exercised its discretion in appointing the Department managing conservator of the children under Texas Family Code section 153.371. We overrule Mother's fifth issue.

To be clear, the trial court retains jurisdiction to modify a conservatorship order if it is in the child's best interest. TEX. FAM. CODE § 156.001. And, Mother has standing to seek a modification if she can show her circumstances have materially and substantially changed since the order was rendered. TEX. FAM. CODE § 156.101. In fact, the Department is tasked, as the managing conservator, to hold a hearing to review the conservatorship appointment at least once every six months. TEX. FAM. CODE §§ 263.002, 265.501. And, at each hearing, the court will look to "whether the child's parents are willing and able to provide the child with a safe environment" and "the extent of progress made towards alleviating or mitigating" the causes for which the child was removed from the home. *In re J.A.J.*, 243 S.W.3d at 617 (quoting TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., CHILD PROTECTION SERVICES HANDBOOK (DFPS HANDBOOK) § 5353); *see also* TEX. FAM. CODE § 263.307(b). When Mother or a family member demonstrates they are capable of providing for the best interest of any of the children, "[t]he Department will then ask to be dismissed as the child's managing conservator." *In re J.A.J.*, 243 S.W.3d at 617 (citing DFPS HANDBOOK § 6231).

## 6    Ineffective Assistance of Counsel

In her final issue[6], Mother argues she received ineffective assistance of counsel. To successfully raise an ineffective assistance of counsel claim in a parental-termination case, a parent must meet the United States Supreme Court's two-prong test articulated in *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *In re D.T.*, 625 S.W.3d 62, 73 (Tex. 2021). Under that standard, a parent appealing a termination order must show by a preponderance of the evidence that (1) trial counsel's performance fell below an objective standard of reasonableness, and (2) the parent was prejudiced by trial counsel's defective performance. *In re J.A.B.*, 562 S.W.3d 726, 729 (Tex. App.—San Antonio 2018, pet. denied) (citing *Strickland*, 466 U.S. at 687). "A failure to establish either prong of the *Strickland* test is fatal to an ineffective assistance claim." *In re J.R.R.*, No. 04-22-00076-CV, 2022 WL 3047099, at *2 (Tex. App.—San Antonio Aug. 3, 2022, no pet.) (mem. op.).

In determining whether counsel's performance fell below an objective standard of reasonableness, we give great deference to counsel's performance, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, including the possibility that counsel's actions are strategic. *In re J.M.O.*, 459 S.W.3d 90, 93 (Tex. App.—San Antonio 2014, no pet.). We take into account all of the circumstances surrounding the case, and primarily focus on whether counsel performed in a reasonably effective manner. *Id.* "It is only when 'the conduct was so outrageous that no competent attorney would have engaged in it,' that

---

[6] This final issue is not listed in the section of Mother's brief entitled "issue presented" and does not appear in the primary text of Mother's brief. *See* TEX. R. APP. P. 38.1(f). Instead, the argument is hidden in between the certificate of service and the appendix. The argument is surrounded by what appears to be a brief involving parties and facts unrelated to the present case. There are two versions of the ineffective assistance argument: one involving the unrelated case and the second referencing the facts of this case. We would be well within our discretion to not consider Mother's argument. *See Davis v. City of San Antonio,* 752 S.W.2d 518, 521 (Tex. 1988). Nonetheless, we consider the ineffective assistance of counsel argument in the interest of justice. *See* TEX. R. APP. P. 38.9; *Bobbit v. Womble*, 708 S.W.2d 558, 560 (Tex. App.—Houston [1st Dist.] 1986, no writ) (addressing contention unsupported by argument or authority in the interest of justice).

the challenged conduct will constitute ineffective assistance." *In re M.S.*, 115 S.W.3d 534, 545 (Tex. 2003) (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)). "[T]o show prejudice, an appellant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *In re J.M.O.*, 459 S.W.3d at 94 (citation omitted); *see Strickland*, 466 U.S at 694.

"[I]neffective assistance of counsel claims must be firmly founded in the record, and the record must affirmatively show the alleged ineffectiveness." *In re D.J.R.*, No. 04-23-00568-CV, 2023 WL 8246666, at *8 (Tex. App.—San Antonio Nov. 29, 2023, no pet.) (mem. op.) (citations omitted). "We may not speculate to find trial counsel ineffective when the record is silent regarding counsel's reasons for his actions." *In re F.L.H. IV*, No. 04-17-00425-CV, 2017 WL 6597829, at *15 (Tex. App.—San Antonio Dec. 27, 2017, pet. denied) (mem. op.) (quoting *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 623 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)).

### 6.1   Deficient Performance

With respect to the first prong of the *Strickland* test—counsel's allegedly deficient performance—Mother complains about (1) counsel's alleged failure to emphasize or challenge certain testimony and (2) counsel's alleged failure to "advocate for alternative solutions."

The record is silent about the counsel's reasons for the manner and conduct of her questioning at trial. We are not permitted to speculate about the reason for her actions. *See In re F.L.H. IV*, 2017 WL 6597829, at *15. We conclude Mother has not demonstrated the complained-of conduct was so outrageous that no competent attorney would have engaged in it. *See In re M.S.*, 115 S.W.3d at 545. Thus, Mother has not established that counsel's performance fell below an objective standard of reasonableness.

Because Mother failed to establish the first prong of the *Strickland* test, we conclude she has not established her ineffective assistance of counsel claim. *See In re J.R.R.*, 2022 WL 3047099, at *2. We overrule Mother's final issue.

## 7    Conclusion

For the reasons set forth above, we reverse the trial court's termination of Mother's parental rights to all five children and render judgment denying termination. We affirm the trial court's order naming the Department as the children's managing conservator.

Velia J. Meza, Justice